ACCEPTED
05-14-00921-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
1/30/2015 4:37:11 PM
LISA MATZ
CLERK

Lisa Matz, Clerk

5th Court of Appeals
FILED: 2/2/2015

**ORAL ARGUMENT REQUESTED**

No. 05-14-00921-CV

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
1/30/2015 4:37:11 PM
LISA MATZ
Clerk

_____

# COURT OF APPEALS

for the

## FIFTH DISTRICT OF TEXAS

Dallas, Texas

_____

**Elizabeth Jane Burks, Individually and as Personal Representative of the Estate of Gene Anderson Burks, Sr., Deceased**
Appellant,
v.

**John J. Duncan, Ph.D.; Alicia Sanga Duncan; Wellmart Heartlab, Inc., d/b/a Viascan of Las Colinas; and John Andrew Osborne, M.D., Ph.D., F.A.C.C.,**
Appellees.

_____

Appeal from County Court at Law No. 4
of Dallas County, Texas, Cause No. CC-12-02824-D
Honorable Ken Tapscott, Presiding Judge

_____

## APPELLEE JOHN ANDREW OSBORNE, M.D., PH.D., F.A.C.C.'S
## BRIEF ON THE MERITS

_____

Russell G. Thornton
THIEBAUD REMINGTON THORNTON BAILEY LLP
4800 Fountain Place
1445 Ross Avenue
Dallas, Texas 75202
(214) 954-2200 – Telephone
(214) 754-0999 – Telecopier
rthornton@trtblaw.com

ATTORNEYS FOR DEFENDANT – APPELLEE JOHN ANDREW OSBORNE, M.D., Ph.D., F.A.C.C.

January 30, 2015

# LIST OF PARTIES AND COUNSEL

In order that members of the Court may determine disqualification or recusal, Appellee certifies that the following is a complete list of the names and addresses of parties to this appeal and their counsel:

| | |
|---|---|
| **APPELLANT:** | Elizabeth Jane Burks, Individually and as Personal Representative of the Estate of Gene Alderson Burks, Sr., Deceased |

**COUNSEL FOR APPELLANTS:**

Lawrence R. Lassiter (appellate & trial counsel)
State Bar No. 11969850
llassiter@millerweisbrod.com
Les Weisbrod
State Bar No. 21104900
lweisbrod@millerweisbrod.com
Luke Metzler
State Bar No. 240772902
lmetzler@millerweisbrod.com
MILLER WEISBROD, LP
11551 Forest Central Drive, Suite 300
Dallas, Texas  75243

| | |
|---|---|
| **APPELLEE:** | John Andrew Osborne, M.D., Ph.D., F.A.C.C. |

**COUNSEL FOR APPELLEE:**

Russell G. Thornton (appellate & trial counsel)
State Bar No. 19982850
rthornton@trtblaw.com
THIEBAUD REMINGTON THORNTON BAILEY LLP
1445 Ross Avenue
Suite 4800
Dallas, Texas  75202

**APPELLEES:**                              John J. Duncan, Ph.D.; Alicia Sanga Duncan;
                                            Wellmart Heartlab, Inc. d/b/a ViaScan of
                                            Las Colinas

**COUNSEL FOR APPELLEE:**

                                            Bradley Dickinson (appellate & trial counsel)
                                            State Bar No. 05834200
                                            bradd@dblaws.com
                                            John Robert Skeels (appellate & trial counsel)
                                            State Bar No. 24048802
                                            rskeels@dblaws.com
                                            DICKINSON BARTLETT, P.C.
                                            4849 Greenville Avenue, Suite 1550
                                            Dallas, Texas  75206

# TABLE OF CONTENTS

LIST OF PARTIES AND COUNSEL ....................................................................... i

INDEX OF AUTHORITIES .................................................................................... iv

REQUEST FOR ORAL ARGUMENT ...................................................................... 2

ISSUES PRESENTED ............................................................................................. 3

    **I.**     **The Trial Court Did Not Abuse Its Discretion in Striking/Excluding The Testimony of Dr. Trotman, and;**

    **II.**    **The Trial Court Did Not Abuse Its Discretion in Denying Appellant's Motion for Continuance.**

STATEMENT OF FACTS ........................................................................................ 4

SUMMARY OF ARGUMENT ................................................................................ 22

ARGUMENT ........................................................................................................... 24

    I.     The trial court did not abuse its discretion in striking/excluding the testimony of Dr. Trotman ........................................................................ 24

    II.    The trial court did not abuse its discretion in denying Appellant's Motion for Continuance ................................................................................ 48

CONCLUSION ....................................................................................................... 50

PRAYER .................................................................................................................. 51

CERTIFICATE OF COMPLIANCE ....................................................................... 52

CERTIFICATE OF SERVICE ................................................................................ 53

# INDEX OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES**

*Daubert v. Merrill Dow Pharms., Inc.,*
509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ................................................... 27

**UNITED STATES COURTS OF APPEALS CASES**

*Watkins v. Telsmith,*
121 F.3d 984 (5th Cir. 1997) ................................................................................................ 26

**TEXAS SUPREME COURT CASES**

*Aluminium Co. of America v. Bullock,*
870 S.W.2d 2 (Tex. 1994) ..................................................................................................... 43

*Cooper Tire & Rubber Co. v. Mendez,*
204 S.W.3d 797 (Tex. 2006) ................................................................................................. 24

*E.I. du Pont de Nemours & Co. v. Robinson,*
923 S.W.2d 549 (Tex. 1995) .......................................... 24, 25, 26, 27, 28, 29, 30, 32, 47

*Exxon Pipeline Co. v. Zwahr,*
88 S.W.3d 623 (Tex. 2002) ................................................................................................... 29

*Gammill v. Jack Williams Chevrolet, Inc.,*
972 S.W.2d 713 (Tex. 1998) .......................................... 26, 28, 29, 32, 33, 36, 38, 40, 46

*In re Christus Spohn Hospital Kleberg,*
222 S.W.3d 434 (Tex. 2007) ................................................................................................. 25

*Merrell Dow Pharms., Inc. v. Havner,*
953 S.W.2d 706 (Tex. 1997) ................................................................................................. 29

*State v. Wood Oil Distrib.,*
751 S.W.2d 863 (Tex. 1988) ................................................................................................. 48

*TXI Transp. Co. v. Hughes,*
306 S.W.3d 230 (Tex. 2010) ................................................................................................. 29

*Villegas v. Carter,*
711 S.W.2d 624 (Tex. 1986) ................................................................................................. 49

*Volkswagen of America, Inc. v. Ramirez,*
159 S.W.3d 897 (Tex. 2004) .............................................................. 33, 36, 38

*Whirlpool Corp. v. Camacho,*
298 S.W.3d 631 (Tex. 2009) .............................................................. 24, 26, 46

**TEXAS COURTS OF CRIMINAL APPEALS CASES**

*Kelly v. State,*
824 S.W.2d 568 (Tex. Crim. App. 1992) ...................................................... 28

**TEXAS COURTS OF APPEALS CASES**

*E.C. v. Graydon,*
28 S.W.3d 825 (Tex. App.—Corpus Christi 2000, no pet.) ............................................. 49

*Ellsworth v. Bishop Jewelry & Loan Co.,*
742 S.W.2d 533 (Tex. App.—Dallas 1987, writ denied) ................................................. 24

*Exxon Corp. v. Makofski,*
116 S.W.3d 176 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ............................ 30

*Fennern v. Whitehead,*
2010 Tex. App. LEXIS 4587 (Tex. App.—Austin)(Jun. 18, 2010)(no pet.)(mem. op) .... 39

*Hamlim v. Ramchandi,*
203 S.W.3d 482 (Tex. App.—Houston [14th Dist.] 2006, no pet) ................................... 29

*Keo v. Vu,*
76 S.W.3d 725 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) .............. 25, 27, 28, 29

*North Dallas Diagnostic Center v. Dewberry,*
900 S.W.2d 90 (Tex. App.—Dallas 1995, writ denied) .................................................. 27

*Taber v. Roush,*
316 S.W.3d 139 (Tex. App.—Houston [14th Dist.] 2010, no pet) ................................... 27

*Thompson v. Mayes,*
707 S.W.2d 951 (Tex. App.—Eastland 1986, writ ref'd n.r.e.) ....................................... 27

*Umanzor v. Helfand,*
1998 Tex. App. LEXIS 4130 (Tex. App.—Dallas 1998, pet. denied)(not designated for
publication) ............................................................................................................... 43

*VingCard A.S. v. Merrimac Hospitality Sys,*
59 S.W.3d 847 (Tex. App.—Fort Worth 2001, pet. denied) ............................................ 43

*Wiggs v. All Saints Health Sys.,*
124 S.W.3d 407 (Tex. App.—Fort Worth 2003, pet. denied) ........................ 27, 28, 33, 38

*Wilson v. Shanti,*
333 S.W.3d 909 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) ........................ 30, 40

**TEXAS RULES OF CIVIL PROCEDURE AND TEXAS RULES OF EVIDENCE**

TEX. R. CIV. EVID. 702 ............................................................................................. 26

TEX. R. CIV. PROC., Rule 193.5 ................................................................................. 43

TEX. R. CIV. PROC., Rule 193.6 ................................................................................. 43

TEX. R. CIV. PROC., Rule 193.6(a) ............................................................................ 44

TEX. R. CIV. PROC., Rule 195.6(a) ............................................................................ 43

**OTHER AUTHORITIES**

Harvey Brown, *Procedural Issues Under Daubert,* 36 Hous. L. REV. 1133, 1159 (1999)
....................................................................................................................................... 25

2 GOODE ET AL., GUIDE TO THE TEXAS RULES OF EVIDENCE:  CIVIL AND CRIMINAL
§702.2 at 17 (Texas Practice, 2d ed. 1993) ................................................................. 25

No. 05-14-00921-CV

_____

# COURT OF APPEALS

for the

FIFTH DISTRICT OF TEXAS

Dallas, Texas

_____

**Elizabeth Jane Burks, Individually and as Personal Representative of the Estate of Gene Anderson Burks, Sr., Deceased**
*Appellant,*

v.

**John J. Duncan, Ph.D.; Alicia Sanga Duncan; Wellmart Heartlab, Inc., d/b/a ViaScan of Las Colinas; and John Andrew Osborne, M.D., Ph.D., F.A.C.C.,**
*Appellees.*

_____

Appeal from Cause No. CC-12-02824-D
County Court at Law No. 4, Dallas County, Texas
Honorable Ken Tapscott, Presiding Judge

_____

**TO THE DALLAS COURT OF APPEALS:**

Appellee John Andrew Osborne, M.D., Ph.D., F.A.C.C., a defendant in Cause No. CC-12-02824-D in the County Court at Law No. 4 of Dallas County, Texas, Honorable Ken Tapscott presiding, respectfully submits his Brief on the Merits. Appellant is Elizabeth Jane Burks, Individually and as Personal Representative of the Estate of Gene Anderson Burks, Sr., Deceased, plaintiff in the county court.

1

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Rule 39 of the TEXAS RULES OF APPELLATE PROCEDURE, Appellee John Andrew Osborne, M.D., Ph.D., F.A.C.C. hereby requests oral argument in this appeal. Appellee John Andrew Osborne, M.D., Ph.D., F.A.C.C. bases his belief that oral argument is needed to assist in the adequate presentation of the arguments and issues before this Court on the fact that oral argument will likely simplify and focus the issues of consequence and significance that are presented in this complicated appeal.

## ISSUES PRESENTED

I.      **The Trial Court Did Not Abuse Its Discretion In Striking/Excluding The Testimony of Dr. Trotman, and;**

II.     **The Trial Court Did Not Abuse Its Discretion In Denying Appellant's Motion For Continuance.**

## STATEMENT OF FACTS

### A.    UNDERLYING CASE FACTS:

This case arises from the attempt to perform a virtual colonoscopy on Decedent Gene Alderson Burks, Sr. ("Decedent") at Wellmart Heartlab, Inc. d/b/a Viascan of Las Colinas on November 1, 2010. By way of background, the terms "colonoscopy," "optical colonoscopy" and "conventional colonoscopy" (hereinafter collectively referred to as "optical colonoscopy"); as well as "virtual colonoscopy" or "colonography" (hereinafter collectively referred to as "VC"), appear extensively in the record and briefing. Optical colonoscopy is what is thought of as a traditional colonoscopy in which a colonoscope is inserted into the patient and the colon is directly examined visually through that device by a gastroenterologist. VC refers to a radiological procedure in which a CT scan is obtained of the patient's colon. This CT scan is then interpreted by a radiologist.

The matters at issue focus primarily on the events of November 1, 2010. It is undisputed that on this day Decedent presented to Viascan and effort was made to perform a second VC on Decedent. Decedent presented to Viascan that day because he required further evaluation following a VC performed there on October 19, 2010. Follow up on the October 19, 2010 VC was needed because the radiologist interpreting that study, Dr. James Blakely, could not determine if a "filling defect" seen on that study represented fecal material or a colon polyp (CR 188, paragraph 6.02).

As reflected in the record, an attempt was made to perform a VC on Decedent at Viascan on November 1, 2010. An optical colonoscopy was not performed because

4

Decedent did not want to undergo that procedure and "implored" personnel at Viascan to perform a repeat VC that day (CR 145, paragraph 6.03).

Appellant alleges that Dr. Osborne ordered Decedent's November 1, 2010 VC and that Dr. Osborne was negligent in ordering this procedure for reasons outlined below. Dr. Osborne disputes and denies this allegation (CR 228-32). Further, the records of Viascan do not contain either a written order from Dr. Osborne authorizing the November 1, 2010 VC, or documentation by someone at that facility that Dr. Osborne verbally ordered this VC (*See,* CR 809-10, Dr. Trotman's deposition, page 161, line 10 – page 162, line 20).

## B.   CASE PROCEDURAL FACTS AND UNDERLYING EVIDENTIARY FACTS:

### 1.   Appellant's Pleadings:

On May 10, 2012, Appellant filed suit against John J. Duncan, Ph.D.; Alicia Sanga Duncan, and; Wellmart Heartlab, Inc. d/b/a Viascan of Las Colinas (hereinafter collectively referred to as "Viascan") (CR 8). In her Original Petition, Appellant alleged that the attempted November 1, 2010 VC was negligent because it was "medically contraindicated, below the standard of care and dangerous" (CR 15, paragraph 7.01(a); CR 16, paragraph 7.02(a); CR 17, paragraph 7.09(d)).

On October 30, 2012, Appellant filed her Second Amended Petition naming John Andrew Osborne, M.D., Ph.D., F.A.C.C. (hereinafter "Dr. Osborne") as a new defendant (CR 852). Appellant still alleged that the November 1, 2010 VC performed by Viascan on Decedent was negligent because it was "medically contraindicated, below the

5

standard of care and dangerous" (Appellant's Second Amended Petition, page 11, paragraph 7.01(a); page 12, paragraph 7.02(a); page 14, paragraph 7.09(d)). Appellant alleged that Dr. Osborne was negligent, if he ordered the November 1, 2010 VC, because it was "medically contraindicated and dangerous for a patient with diverticulosis" (Appellants' Second Amended Petition, page 15, paragraph 7.12(a)).

### 2.      Appellant's Expert Disclosures:

On November 19, 2013, Appellant designated her expert witnesses (CR 857). Appellant designated Bruce W. Trotman as her retained expert. Appellant provided Dr. Osborne and Viascan two reports from Dr. Trotman in her designation. One report was dated April 20, 2012 ("First Report") (CR 756-760). The other report was dated September 4, 2012 ("Second Report") (CR 762-767).

The First Report contains no mention of or reference to Dr. Osborne. In expressing criticism of Viascan, the First Report states that the November 1, 2010 VC was "dangerous and inappropriate" because of the presence of diverticulosis in Decedent's colon (CR 758, first paragraph). The First Report goes on to state that the November 1, 2010 VC was "medically contraindicated and dangerous" because of Decedent's diverticulosis (CR 759, paragraph entitled BREACH OF THE STANDARD OF CARE AND NEGLIGENCE). The First Report also claims conscious indifference against Viascan, stating it "should have known that this procedure [the November 1, 2010 VC] was medically contraindicated for patients with diverticulosis" (CR 760, paragraph entitled GROSS NEGLIGENCE/CONSCIOUS INDIFFERENCE). With respect to causation, the First Report asserts that Decedent suffered a ruptured cecum at the time of

6

the November 1, 2010 VC and that putting air into the colon on "a patient with diverticulosis would create a risk of perforation of the colon" (CR 759, paragraph entitled CAUSATION).

The Second Report addressed Appellant's claims against Dr. Osborne, and supplemented, but did not replace, the First Report (CR 762-67). In the Second Report, Dr. Trotman asserted as to Dr. Osborne all of the above-statements he made against Viascan in the First Report (CR 763, 766). As to Dr. Osborne, Dr. Trotman also asserted the same causation statement that was in the First Report (CR 766).

The opinions set forth in Dr. Trotman's two reports were said to be based on his training and experience, personal knowledge and review of records provided to him by Appellant's counsel (CR 757, 762). Dr. Trotman's two reports do not reflect that his opinions were based on any specific medical literature or references and Dr. Trotman's two reports do not reflect that he consulted, researched or reviewed any pertinent medical literature or references in reaching his opinions or reviewing the case.

Pursuant to an agreed motion for continuance subsequently submitted by the parties, the trial court set this matter for trial on July 8, 2014.

On June 5, 2014, thirty-three days before trial, Appellant served Dr. Osborne and Viascan with her Fourth Supplemental Responses to All Defendants' Requests for Disclosure and Designation of Expert Witnesses (CR 739-754). This was the final time Appellant supplemented her responses to Requests for Disclosure and/or Designation of Expert Witnesses. The only substantive information Appellant disclosed to Dr. Osborne and Viascan about Dr. Trotman's expected impressions, opinions, testimony and the

7

bases of such impressions, opinions and testimony was the information provided in Dr. Trotman's First Report and Second Report (CR 743-44).

### 3.     Dr. Trotman's June 13, 2014 Deposition Testimony:

Dr. Trotman was deposed on June 13, 2014, twenty-five days before trial (CR 769). Dr. Trotman's deposition was noticed by Appellant's counsel and Appellant's counsel performed direct and re-direct examinations of Dr. Trotman that day (CR 770-773; 810-814; 818).

At this time Dr. Trotman disclosed a number of new opinions and new bases for his opinions that had not previously been disclosed. Dr. Trotman also made a number of admissions that showed the opinions offered in his two reports and in his deposition were not sufficiently reasonably-based and reliable to allow for their admission at trial.

First and foremost, Dr. Trotman testified that he had no personal knowledge of or experience with VCs. Dr. Trotman admitted that he had never performed a VC (CR 781, deposition page 47, lines 5-6; CR 786, deposition page 69, lines 5-7). Dr. Trotman also admitted that he was not qualified to perform a VC (CR 781, deposition page 46, lines 15-18). In fact, Dr. Trotman has never even personally witnessed performance of a VC (CR 781, deposition page 47, lines 7-8).

At this deposition, Dr. Trotman produced a number of medical references that he had reviewed and on which he based his opinions (CR 806, deposition page 146, lines 5-8). These references were provided to Dr. Trotman by Appellant's counsel about two or three weeks before his deposition (CR 793, deposition page 97, line 15 – page 98, line 14). This means that Appellant's counsel provided these materials to Dr. Trotman

8

sometime around May 23, 2014 to May 30, 2014. Significantly, Appellant failed to disclose in her June 5, 2014 disclosure and expert designation supplementation the fact that Dr. Trotman had been provided these materials, was going to review these materials and was going to rely on these materials to support his opinions (CR 739-54).

Dr. Trotman testified that in connection with his work in this case, he personally did not research the existing literature on VC or any of the issues before him (CR 794, deposition page 98, lines 15-21; CR 817, deposition page 190, lines 18-21; CR 817, deposition page 191, lines 8-15). With respect to any medical reference information, Dr. Trotman admitted that he did not consult any such information until more than two years after he reached his opinions in this matter (CR 793, deposition page 97, line 15 – page 98, line 14). Thus, even though Dr. Trotman affirmatively stated in his First Report, "I am familiar with the standard of care for performing … virtual colonoscopies" (CR 756, last paragraph), Dr. Trotman had no legitimate basis on which to make that statement. At that time, he had no personal knowledge of or experience with VCs, and he had not reviewed any medical reference information on VCs (CR 781, 794, 817).

When Dr. Trotman did finally look at medical references, he wholly relied on Appellant's counsel to research and provide him with an accurate representation of the relevant existing medical literature and data (CR 817, deposition page 190, lines 8-21; CR 817, deposition page 191, lines 8-15). Dr. Trotman also admitted that Appellant's counsel help him write both his two reports (CR 797, deposition page 111, line 18 – page 112, line 2; CR 807, deposition page 153, lines 8-16).

In Dr. Trotman's two reports, he claimed the existence of diverticulosis in Decedent's colon made his November 1, 2010 VC "medically contraindicated and dangerous" (CR 759, 763). Dr. Trotman admitted during his deposition, however, that he was not aware of any medical literature stating diverticulosis contraindicates performance of a VC (CR 795, deposition page 102, lines 16-22). Not even Appellant counsel's hand-picked references stated diverticulosis contraindicated a VC. In fact, one of the medical references in the record states that one indication for a VC is the existence of "severe diverticular disease" (CR 700, Box 1).

Dr. Trotman testified that Decedent's diverticulosis was limited to his sigmoid colon (CR 798, deposition page 114, lines 16-18). Dr. Trotman agreed that there was no evidence of diverticulosis in Decedent's cecum, the location where Dr. Trotman claims Decedent's colon popped and was ruptured on November 1, 2010 (CR 798, deposition page 116, lines 21-24).

The event Dr. Trotman claims occurred during Decedent's attempted November , 2012 VC was a rupture of his cecum (CR 798, deposition page 115, lines 3-18). A patient's cecum is a an area/structure completely separate and apart from his sigmoid colon. In fact, the cecum is approximately four feet upstream from the sigmoid colon (CR 685, deposition of Dr. Blakely, page 217, line 13 – page 218, line 7).

For the first time at deposition Dr. Trotman contended that during the November 1, 2010 VC too much air was improperly injected into Decedent's colon and his cecum popped (CR 799, deposition page 121, lines 15-18). This opinion is nowhere in either Dr. Trotman's First Report or Second Report (CR 756-760; 762-67).

10

Dr. Trotman also did not present anything in support of this "too much air" contention other than his assertion this occurred (*See,* 2 RR 35-36).

Dr. Trotman testified, however, that when air is forced out through the colon when it pops or ruptures, that air usually remains in the patient's abdomen (CR 199, Deposition page 121, lines 19-22). Dr. Trotman further stated that CT and flat or x-ray studies are specific and sensitive for detecting free air in the abdomen (CR 808, deposition page 154, line 17 – page 155, line 17). In fact, Dr. Trotman testified that if a CT had been performed on Decedent before he left Viascan on November 1, 2010, it would have shown free air in the abdomen indicating a perforation of the cecum (CR 812, deposition page 171, lines 2-12). In fact, Dr. Trotman testified that "a little tiny bit of air can fill a lot of space in the abdominal – in the abdomen" (CR 789, deposition page 79, lines 7-9).

The underlying facts of the case show that on November 1, 2010, Viascan attempted to insufflate air into Decedent's rectum and colon in an effort to perform a VC (*See, CR* 188, 831, paragraph 6). The procedure could not be completed that day because per Viascan documentation Decedent's sphincter did not retain the air being injected into his colon (*See,* CR 830, paragraph 5). Dr. Trotman argues that Decedent was not retaining air because his colon became overinflated, his cecum ruptured and this air was being pumped into Decedent's abdomen through the perforation in his cecum.

If Dr. Trotman's theory is correct, first, enough air had to have been injected into Decedent's rectum such that not only his entire colon was filled with air, but such that so much air was injected into Decedent's colon that it was overinflated to the extent that his cecum, a structure at the complete opposite end of Decedent's colon, popped and

11

ruptured (*See,* CR 258, illustration of colon and its anatomy). The distance between the rectum and colon is in excess of four feet (CR 685, Deposition of Dr. Blakely, page 217, line 13 – page 218, line 7). Thus, a huge amount of air had to have been placed into Decedent's colon in order for Dr. Trotman's theory of the case to be valid. Further, if a perforation occurs (per Dr. Trotman himself), "a little tiny bit of air can fill a lot of space in the abdominal – in the abdomen" (CR 789, deposition page 79, lines 7-9).

The underlying facts establish that when Decedent was seen and evaluated with CT scans and x-rays in the days immediately following his November 1, 2010 VC, the radiologists interpreting these studies saw no free air indicative of a perforation (CR 788-89, Dr. Trotman's deposition, page 77, line 24 – page 78, line 2 ; CR 667, Dr. Blakely's deposition page 145, line 17 – page 146, line 20; CR 685, Dr. Blakely's deposition page 218, line 8 – page 219, line 23).

Dr. Trotman testified that he based his opinion that Decedent's cecum popped ruptured at the time of his November 1, 2010 VC on the presence of some "little" air bubbles he claims he sees on subsequent radiology studies (CR 799, deposition page 119, lines 9-23). The radiologists who interpreted these studies, however, did not identify any of the air bubbles Dr. Trotman claims are present (CR 788-89, deposition page 77, line 24 – page 78, line 2).

The degree of air that Dr. Trotman claims is present on these studies, however, is significantly less than what would be expected if a perforation actually occurred, given Dr. Trotman's earlier admission that "a tiny bit of air can fill a lot of space in the abdomen." Where then is all of this air, if Dr. Trotman's theory of the case is correct?

12

Dr. Trotman admitted that based on the subsequent radiology studies obtained on Decedent, all of the injected air that supposedly caused Decedent's cecum to rupture is neither in Decedent's abdomen nor in his colon (CR 809, deposition Page 160, line 19 – page 161, line 7).

When asked about this, to get around the absence of the free air Dr. Trotman earlier admitted is expected and should "fill a lot of space in the abdominal – the abdomen" (CR 789, deposition page 79, lines 7-9), Dr. Trotman stated that when Decedent's cecum ruptured on November 1, 2010 at Viascan, bleeding occurred, but that this bleeding suddenly and spontaneously stopped and sealed over the perforation and rupture, resulting in a large hematoma (CR 789, deposition page 79, lines 10-16; CR 799-800, Deposition page 121, line 23 – page 122, line 9). The fact of the matter is, however, that this hematoma (which Dr. Trotman claims evidences rupture of the cecum) is located in the ascending colon, not the cecum (CR 788, deposition page 76, lines 5-11; CR 799, deposition page 118, lines 12-15). Further, Dr. Trotman could not and did not explain where all the air went.

Dr. Trotman claims his immediate bleeding and sealing of the rupture of the cecum theory is correct because Decedent was significantly over-anti-coagulated at that time (CR 789, deposition page 79, line 10-11). This opinion makes no medical sense, given the fact that if someone is over-anti-coagulated they can spontaneously bleed and their blood cannot clot because the clotting mechanism in their blood is inhibited (*See,* CR 801, deposition page 126, lines 2-16; CR 801, deposition page 127, line 24 – page 128, line 8).

The medical reference information before the trial court on Decedent's anticoagulation medication, Coumadin, also contradicts Dr. Trotman's spontaneous blood clotting over the popped cecum theory (CR 332-350). This reference, the prescribing information on Coumadin, states in numerous places that there is a "bleeding risk" associated with the use of Coumadin (CR 332, within Black Box Warning; CR 333, "ADVERSE REACTIONS" and box in lower 1/3 of page; CR 337, paragraph 5.1; CR 338, paragraph 6.0; CR 347, last paragraph of page). In fact, this reference states that the bleeding that may occur with the use of Coumadin can be "major or fatal" (CR 332, within Black Box Warnings; CR 333, "ADVERSE REACTIONS" and box in lower 1/3 of page; CR 337, paragraph 5.1). This reference, much better than Dr. Trotman's unsupported theory, explains the hematoma in Decedent's ascending colon and his subsequent death.

Dr. Trotman's "popped cecum and spontaneous blood clotting" theory is further controverted by the fact that Coumadin's mechanism of action is to inhibit certain "clotting factors" in the blood (CR 342, paragraph 12.1). The reference goes on to explain that "COUMADIN is a blood thinner medicine that lowers the chance of blood clots forming in your body" (CR 347, last paragraph).

Dr. Trotman also stated that when Decedent was admitted to the hospital on December 2, 2010, his INR, a measurement of the degree to which his blood was inhibited from clotting, was "increased to 9…which is four times where you should be" (CR 788, deposition Page 76, lines 2-4; CR 799-800, deposition Page 121, line 23 –

14

page 122, line 9). The Coumadin prescribing information also provides that an INR greater than 4.0 "is associated with a higher risk of bleeding" (CR 334, paragraph 2.2).

Based on the information in the Coumadin reference, that last thing one would expect when a patient who is taking Coumadin, has an INR of 9 and then suffers a ruptured cecum is some bleeding, immediately followed by spontaneous clotting; as proposed by Dr. Trotman. Even if Dr. Trotman's "popped cecum and spontaneous blood clotting" theory is somehow possible in spite of medical evidence to the contrary; again, where did all the air go? Dr. Trotman admits the air was not in either in Decedent's abdomen or in his colon (CR 809, Deposition Page 160, line 19 – page 161, line 7).

Dr. Trotman also admitted on numerous occasions that an optical colonoscopy, the procedure he contends should have been performed because the VC was purportedly contraindicated; is more dangerous than a VC (CR 784, deposition page 58, lines 2-5; CR 785, deposition page 63, lines 13-16; CR 788, deposition page 74, lines 5-10; CR 793, deposition page 97, lines 5-14; CR 814, deposition page 179, line 24 – page 180, line 18). Dr. Trotman admitted that as to the risk of perforation, the risk of perforation is higher in an optical colonoscopy (CR 788, deposition page 74, lines 5-10; CR 793, deposition page 97, lines 5-14). In fact, Dr. Trotman stated under oath that in comparison to VC, a perforation is ten times more likely to occur in an optical colonoscopy (CR 784, deposition page 58, lines 2-5).

The significant safety benefit that VC provides over an optical colonoscopy is also shown by the reference "Incidence of Colonic Perforation at CT Colonography" (CR 607-10). In discussion of the lower risk of perforation associated with VC when

15

compared to an optical colonoscopy, this reference states "more important, reported cases of perforation at optical colonoscopy more often result in surgery and even death compared with [VC]" (CR 610, middle column, first paragraph).

Dr. Trotman then claimed that an optical colonoscopy was indicated because there was the possibility that Decedent had a polyp per his prior VC (CR 784, deposition page 59, lines 11-18). He stated that if a polyp was found on the November 1, 2010 VC, an optical colonoscopy would be required (*See, e.g.,* CR 795, deposition page 104, lines 12-20). This opinion, however, is not supported by the evidence in this case.

First, literature in the record establishes that it is not recommended all polyps found on VC be removed. Specifically, the study entitled "CT Colonography: Current Status and Future Promise" (CR 696-724), states that if a polyp is found during VC, "gastroenterologists generally agree" that an optical colonoscopy and removal of that polyp is recommended only if the polyp found on VC is 6mm or larger in size (CR 717, second paragraph). This reference goes on to state that the American College of Gastroenterology agrees with and has endorsed this recommendation (CR 717).

Second, in response to questions from Appellant's counsel at deposition, Dr. Ritter, a defense expert, confirmed that based on the size of a polyp found on VC, there is discretion as to whether or not an optical colonoscopy is required to remove that polyp (CR 435, deposition page 26, lines 2-16).

### 4. Dr. Trotman's July 3, 2014 Deposition Changes:

On July 3, 2014, less than one week before trial, Dr. Trotman submitted changes to some of the answers he provided during his deposition (CR 822-27). Of significance,

Dr. Trotman changed an answer that he provided on page 97, line 14 of his deposition (CR 793). At deposition, Dr. Trotman testified:

> Q. (BY MR. SKEELS) So performing an optical colonoscopy would have been of greater risk to Mr. Burks?
>
> A. Certainly (CR 793, deposition page 97, lines 11-14).

On July 3, 2014, Dr. Trotman changed his answer from "Certainly" to "For the first colonoscopy, but not for the November 1, 2010 virtual colonoscopy" (CR 826). Of key significance is the fact that Dr. Trotman did not change the answer he provided to the immediate preceding question:

> Q. (BY MR. SKEELS) So it is not your contention in this case that a virtual colonoscopy was a greater risk of perforation than was an optical colonoscopy?
>
> MR. METZLER: Form and foundation.
>
> A. My contention – okay. I could – I could agree with that (CR 793, deposition page 97, lines 5-10).

With respect to the risks associated with the November 1, 2010 VC, Dr. Trotman did not change the following answer he provided under oath:

> Q. (BY MR. SKEELS) Which one is more – and we're talking specifically about the second virtual colonoscopy.
>
> Which one is more dangerous in terms of perforation, virtual colonoscopy or optical colonoscopy?
>
> A. The answer to the question, probably optical (CR 788, deposition page 74, lines 5-10).

Further, Dr. Trotman did not change the following testimony:

> Q. So strictly in terms of perforation, based on your review, its ten times more likely you're going to perforate a colon in an optical colonoscopy?

17

A. Yeah. I would think that's reasonable (CR 784, deposition page 58, lines 2-5).

### 5.      5. Dr. Trotman's July 8, 2014 Declaration:

On July 8, 2014, Appellant filed the Declaration of Bruce W. Trotman, M.D. (CR 829-34). In this Declaration, Dr. Trotman provided the following new testimony with respect to the risk of perforation associated with a virtual colonoscopy in a patient with diverticulosis:

> That risk is not confined to the location of the diverticulosis, as the diverticulosis reflects weakness of the wall of the colon which is likely found in numerous areas of the colon wall, including the cecum, once diverticulosis is diagnosed. This is well-established in the medical literature and is known to both radiologists who interpret colonoscopies, as well as gastroenterologists (CR 833, paragraph 15).

Of significance here is the fact that Dr. Trotman provided the following testimony during his deposition that was not altered, changed or revised in his July 3, 2014 deposition changes (CR 826):

Q. Now, where was Mr. Burks' diverticulosis identified?

A. It was in the sigmoid colon (CR 798, deposition page 114, lines 16-18).

Q. Mr. Metzler asked you if the existence of diverticulosis was an abnormality of the colon. Do you recall that?

A. Yes.

Q. Okay. And – and in Mr. Burks' case, the diverticulosis that he had was in his sigmoid colon, correct?

A. Correct.

Q. And so that was the area of abnormality in his colon from diverticulosis, correct?

A. Correct (CR 818, deposition page 194, lines 10-21).

Q. (BY MR. SKEELS) Did the diverticulosis in the sigmoid colon increase the risk of cecal perforation?

A. Not necessarily so.

Q. Is that a no?

A. No (CR 799, deposition page 118, lines 3-7).

So, Dr. Trotman's Declaration statement on the risk of perforation associated with diverticulosis was the complete and total opposite of unchanged testimony that he provided under oath at his deposition.

While Dr. Trotman stated in the Declaration that his new opinion about diverticulosis was "well-established in the medical literature," he neither cited to nor identified any of this "medical literature." Dr. Trotman also stated in this Declaration that these purported facts about diverticulosis are "known to radiologists who interpret colonoscopies as well as gastroenterologists." Dr. Trotman did not provide any factual support for this conclusory statement. Additionally, evidence in the record completely contradicts this conclusory statement.

Dr. James Blakely, the radiologist who interpreted Decedent's October 19, 2010 VC was deposed (CR 631-84). Dr. Blakely provided the following testimony on this issue at his deposition:

Q. (BY MR. SKEELS) Is it possible that diverticulosis of the sigmoid colon contributed to a cecal perforation?

MR. METZLER: Form and foundation.

A. I've never seen that happen. Anything is possible, but I've never seen, read, or heard about that (CR 688, deposition page 213, lines 11-17).

In this Declaration, Dr. Trotman also states reasons he believes an optical colonoscopy is safer than a VC (contradicting his earlier testimony under oath that an optical colonoscopy was more dangerous than a VC), including his opinion that an optical colonoscopy has an advantage over VC because if a perforation of the colon occurs during an optical colonoscopy that perforation can be seen during the procedure, whereas with VC one cannot know if a perforation occurred (831-32). Understanding that a VC is a CT examination of the colon, this opinion directly contradicts Dr. Trotman's deposition testimony that the scout CT done as part of the VC will show "right away" if a perforation has occurred (CR 789, deposition Page 78, line 22 – page 79, line 9).

Dr. Trotman's opinion that an optical colonoscopy is better able than a VC to detect a perforation is also contradicted by the reference entitled "CT Colonography: Perforation Rates and Potential Radiation Risks" (CR 568-80). This reference states, "[VC] inherently detects even tiny amounts of free air that would otherwise not be detected by other examinations such as colonoscopy…" (CR 569). Thus, VC has this distinct advantage over optical colonoscopy when it comes to detection of perforations caused by the procedure. In addition, Dr. Trotman acknowledged that in his personal experience he had perforated a patient's colon during an optical colonoscopy and was not aware that had occurred during the procedure (CR 785, Deposition Page 64, lines 7-17).

20

**6.     The Trial Court's Actions:**

The trial court invited and accepted arguments from counsel and extensively questioned counsel over the course of 3 days (July 7, 2014, July 8, 2014, and July 9, 2014)(RR Volumes 2, 3, and 4).  During this time, the trial court also made clear that it was not going to consider evidence from Dr. Trotman that was not properly and timely disclosed by Appellant 30 days prior to trial (*See, e.g.* 2 RR, pages 20-33).

## SUMMARY OF ARGUMENT

Once Dr. Trotman was challenged, Appellant had the burden to establish Dr. Trotman was sufficiently qualified to offer expert testimony in this matter, that the testimony he intended to offer was relevant, and that his opinions were sufficiently reasonably-based and reliable to allow for their admission at trial. Further, Appellant was also under a duty to timely disclose to Dr. Osborne and Viascan Dr. Trotman's expected impressions and opinions and the bases for any such impressions and opinions. The trial court had the ability and duty to exclude/strike any opinions that were not sufficiently reasonably-based and reliable to allow for their admission at trial, as well as any impressions and opinions and the bases for any such impressions and opinions that were not timely disclosed.

The trial court did not abuse its discretion in excluding/striking Dr. Trotman. The record reflects Appellant did not carry her burden to show that Dr. Trotman's opinions were sufficiently reasonably-based and reliable to allow for their admission. In particular, Appellant failed to show that Dr. Trotman's impressions and opinions were reached through some legitimate scientific or professional methodology. The record also shows that it was not until about thirty days before trial that there was any possible legitimate basis for Dr. Trotman's opinions.

When Dr. Trotman finally utilized literature in this case, it was more than two years after he issued his initial opinions, and not until about thirty days before trial. Further, the literature he utilized was only information provided to him by Appellant's

22

counsel.  At no time did Dr. Trotman make any personal effort to locate or review the pertinent and relevant medical literature.

Further, many opinions offered by Dr. Trotman were contradictory and inconsistent with his own sworn testimony.  Many of his opinions were also contradicted by and inconsistent with medical references in the record.  Finally, Dr. Trotman inconsistently and completely changed his testimony at the last-minute in an effort to prevent his testimony from being stricken, again contradicting his prior sworn testimony.

The record also shows that even though Appellant knew Dr. Trotman had been provided references to review in May 2014, and even though Appellant knew this information would be used to provide a basis for Dr. Trotman's opinions, (actually the only real basis for his opinions), Appellant chose not to disclose this fact to Dr. Osborne and Viascan on June 5, 2014 when she last supplemented her disclosure responses before (1) Dr. Trotman's June 13, 2014 deposition and (2) the July 8, 2014 trial setting.

Based on these facts, the trial court did not abuse its discretion in excluding/striking Dr. Trotman.  Further, based on these same facts, in addition to the fact that Appellant unconditionally announced ready for trial (CR 461), the trial court did not abuse its discretion in denying Appellant's motion for continuance.

For all of these reasons, the trial court's action below should be affirmed.

## ARGUMENT

**I.     The Trial Court Did Not Abuse Its Discretion In Striking/Excluding The Testimony of Dr. Trotman:**

### A.     Standard of Review:

A trial court's ruling on the admissibility of expert testimony under Rule 702 and pursuant to *Daubert v. Merrill Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny is reviewed under an abuse of discretion standard. *Whirlpool Corp. v. Camacho,* 298 S.W.3d 631, 638 (Tex. 2009); *Cooper Tire & Rubber Co. v. Mendez,* 204 S.W.3d 797, 800 (Tex. 2006).  A trial court's exclusion of evidence based on a party's failure to timely supplement discovery in advance of trial and establish good cause for same is also reviewed under an abuse of discretion standard. *See, Ellsworth v. Bishop Jewelry & Loan Co.,* 742 S.W.2d 533, 534 (Tex. App.—Dallas 1987, writ denied).

An abuse of discretion does not exist simply because this Court would have ruled differently under the same circumstances. *Id.*  An abuse of discretion also does not exist if the trial court committed a "mere error in judgment." *Id.*  Put another way, the test for an abuse of discretion "is not whether the facts present an appropriate case for the trial court's action in the opinion of the reviewing court." *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex. 1995).

An abuse of discretion exists only if the trial court acted without reference to any guiding rules or principles. *Robinson,* 923 S.W.2d at 558.  With respect to the admission of expert testimony, "a trial court enjoys wide latitude in determining whether expert

testimony is admissible." *Keo v. Vu,* 76 S.W.3d 725, 730 (Tex. App.—Houston [1ˢᵗ Dist.] 2002, pet. denied)(citing Harvey Brown, *Procedural Issues Under Daubert,* 36 Hous. L. REV. 1133, 1159 (1999)).

### B.     Trial Court's Duty As Gatekeeper:

The trial court's role as the gate-keeper of expert testimony arises from the fact that expert witnesses hold a unique place in our civil justice system.  As noted by the Texas Supreme Court in *In re Christus Spohn Hospital Kleberg,* 222 S.W.3d 434, 440 (Tex. 2007):

> The expert is generally held out to be, and is seen by the jury as, an objective authority figure more knowledgeable and credible than the typical lay witness…For this reason, juries are prone to rely on experts to tell them how to decide complex issues without independently analyzing underlying factors…As the Supreme Court has noted, [e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it (internal citations and quotations omitted).

It also known and accepted that "professional expert witnesses are available to render an opinion on almost any theory, regardless of its merit." *Robinson,* 923 S.W.2d at 553.  Within the realm of potential experts, "there are some experts who 'are more than willing to proffer opinions of dubious value for the proper fee.'" *Id.* (quoting 2 GOODE ET AL., GUIDE TO THE TEXAS RULES OF EVIDENCE:  CIVIL AND CRIMINAL §702.2 at 17 (TEXAS PRACTICE, 2d ed. 1993)).  These and other concerns about the use of expert witnesses have resulted in trial courts being appointed as and required to act as the gate-keepers of expert testimony.  *See, Robinson,* 923 S.W.2d at 550, 553-54, 556.

In its role as the gate-keeper of expert testimony, the trial court must "rigorously examine the validity of facts and assumptions on which the [expert] testimony is based,

as well as the principles, research, and methodology underlying the expert's conclusions and the manner in which the principles and methodologies are applied by the expert to reach the conclusions." *Camacho,* 298 S.W.3d at 637. In deciding on the admissibility of expert testimony, trial courts are not required to admit expert testimony that is connected to existing data by nothing other than the *ipse dixit* of the expert. *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726 (Tex. 1998).

In determining whether to admit expert testimony, the trial court must also "ensure that the [expert] opinion comports with applicable professional standards outside the courtroom and that it 'will have a reliable basis in the knowledge and experience of the discipline." *Gammill,* 972 S.W.2d at 725-26 (quoting *Watkins v. Telsmith,* 121 F.3d 984, 991 (5th Cir. 1997)).

This Court must also keep in mind the fact that the availability of cross-examination at trial does not relieve the trial court of its gate-keeping role and its responsibility to rigorously examine the foundation and relevance of expert testimony. *Gammill,* 972 S.W.2d at 728 (citing *Daubert,* 509 U.S. at 597).

C.      **Additional Applicable Guiding Rules and Principles:**

Rule 702 of the TEXAS RULES OF EVIDENCE requires three hurdles to be cleared in order for expert testimony to be admissible. These requirements are (1) the expert must be qualified, (2) the expert's testimony must be "scientific …knowledge," and (3) the expert's testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Robinson,* 923 S.W.2d at 556 (quoting TEX. R. CIV. EVID. 702).

In order for expert testimony to clear the second and third hurdles of Rule 702, "the expert's opinion should be based on an existing body of scientific, technical or other specialized knowledge that is pertinent to the facts of the case." *North Dallas Diagnostic Center v. Dewberry,* 900 S.W.2d 90, 94 (Tex. App.—Dallas 1995, writ denied)(citing *Thompson v. Mayes,* 707 S.W.2d 951, 956 (Tex. App.—Eastland 1986, writ ref'd n.r.e.)). *See, also, Robinson,* 923 S.W.2d at 555. Additionally, "expert testimony must be based on a reliable foundation of scientific or professional technique or principle." *Taber v. Roush,* 316 S.W.3d 139, 148 (Tex. App.—Houston [14th Dist.] 2010, no pet.)(citing *Robinson,* 923 S.W.2d at 557; *Wiggs v. All Saints Health Sys.,* 124 S.W.3d 407, 410 (Tex. App.—Fort Worth 2003, pet. denied)).

In order for an expert's opinions to constitute "scientific knowledge," that testimony must be shown to be reliable. *Robinson,* 923 S.W.2d at 555. Importantly, "scientific evidence which is not grounded 'in the methods and procedures of science' is no more than 'subjective belief or unsupported speculation.'" *Robinson,* 923 S.W.2d at 557 (quoting *Daubert,* 113 S.Ct. at 2795). Said another way, "when the expert's underlying scientific technique or principle is unreliable, the expert's opinion is no more than subjective belief or unsupported speculation and is inadmissible." *Keo v.Vu,* 76 S.W.3d 725, 733-34 (Tex. App.—Houston [1st Dist.] 2002, pet. denied)(citing *Gammill,* 972 S.W.2d at 720; *Robinson,* 923 S.W.2d at 557).

The scientific process does not involve first reaching a conclusion and then doing research to support that conclusion. *Robinson,* 923 S.W.2d at 559. Instead, an expert must show the he or she reasoned from known facts and principles to reach a conclusion.

27

*Id.* An expert's self-serving statements that his or her methodology is generally accepted and reasonably relied on by other experts is not sufficient to establish the reliability of his or her technique and the theory underlying his or her opinion. *Id.* at 559. Also, experts cannot establish that their opinions are reasonably-based and reliable "by stating that their conclusions were not reached by any particular method or technique." *Gammill,* 972 S.W.2d at 725.

"Unreliable evidence is of no assistance to the trier of fact." *Robinson,* 923 S.W.2d at 557 (citing *Kelly v. State,* 824 S.W.2d 568, 572 (Tex. Crim. App. 1992)). In evaluation of the reliability of an expert's testimony, the trial court may consider the degree to which the expert possessess "special knowledge as to the very matter on which he proposes to give an opinion." *Keo,* 76 S.W.3d at 734 (quoting *Gammill,* 972 S.W.2d at 718). In this respect, an expert's underlying qualifications and experience come into play in assessment of whether his or her opinions are sufficiently reasonably-based and reliable to allow for their admission at trial. *See, Wiggs,* 124 S.W.3d at 412-13.

A number of methods exist through which trial courts can evaluate whether an expert's opinions are sufficiently reasonably-based and reliable to allow for admission at trial. Trial courts have the ability to utilize the six non-exclusionary *Robinson* factors. These factors are:

(1)    The extent to which the expert's theory has been tested;
(2)    The extent to which the expert's technique relies on his or her subjective interpretation;
(3)    Whether the expert's theory has been subjected to peer review and/or publication;
(4)    The technique's potential rate of error;

28

(5) Whether the underlying technique or theory has been generally accepted as valid by the relevant scientific community, and;

(6) The non-judicial uses of the theory or technique

*Robinson,* 923, S.W.2d at 557.

Again, these factors are non-exclusive and the trial court may consider other factors that are helpful in determining reliability. *See, Hamlim v. Ramchandi,* 203 S.W.3d 482, 490 (Tex. App.—Houston [14th Dist.] 2006, no pet.)(citing *Robinson,* 923 S.W.2d at 557). Such "other factors" that can be used by the trial court will differ with each case. *Robinson,* 923 S.W.2d at 557.

For example, the trial court may review an expert's opinions for analytical gaps between the data and facts on which the expert relies and the opinion offered. *Gammill,* 972 S.W.2d at 727. Ultimately, it is up to the trial court to determine how the reliability of the expert testimony at issue is to be assessed. *Gammill,* 972 S.W.2d at 726.

In addressing the admissibility of expert testimony in this respect, the trial court is not to determine whether the expert's conclusions are correct. *Keo,* 76 S.W.3d at 734. The focus is whether the analysis the expert used to reach the conclusions offered is reliable. *TXI Transp. Co. v. Hughes,* 306 S.W.3d 230, 239 (Tex. 2010)(citing *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 629 (Tex. 2002) and *Gammill,* 972 S.W.2d at 728). In this respect, even if the underlying data is sound, an expert's testimony can be unreliable if the conclusions drawn from that data is based on a flawed methodology. *Keo,* 76 S.W.3d at 734 (citing *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 721-29 (Tex. 1997).

29

**D.    Burden to Establish Reasonable-Basis and Reliability of Expert Testimony:**

The proponent of an expert and his or her testimony bears the burden of establishing that the expert's opinions are relevant, reasonably-based and reliable. *Robinson,* 923 S.W.2d at 556.   Thus, as dictated by the Texas Supreme Court in *Robinson,* once Dr. Trotman's opinions were challenged, Appellant had the burden to establish that Dr. Trotman's opinions were sufficiently reasonably-based and reliable. *See, Gammill,* 972 S.W.2d at 718; *Robinson,* 923 S.W.2d at 556.

Because Dr. Trotman's opinions were challenged as not being reasonably-based or reliable, the trial court could not just accept Dr. Trotman's testimony at face value. *Wilson v. Shanti,* 333 S.W.3d 909, 913 (Tex. App.—Houston [1st Dist.] 2011, pet. denied)(citing *Exxon Corp. v. Makofski,* 116 S.W.3d 176, 180 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).  Appellant had the burden to come forward with evidence that established the reasonableness and reliability of his opinions, as well as (1) the methodology Dr. Trotman used to reach his opinions, (2) the foundational data on which Dr. Trotman's opinions were based, and (3) how any analytical gaps were filled that existed between Dr. Trotman's methodology and/or foundational data and his opinions. As explained immediately below, Appellant did not carry this burden.

**E.    Application of Law to the Facts (Dr. Trotman's Opinions):**

Appellant failed to show the trial court that Dr. Trotman's opinions were sufficiently reasonably-based and reliable to allow for their admission at trial.  In fact, there was nothing "scientific" about the manner in which Dr. Trotman reached his

opinions in this matter. Dr. Trotman created "expert" two reports (with the assistance of Appellant's counsel) without having any personal knowledge of and experience with the procedure at issue, VC (CR 781). Further, absent any personal knowledge of or experience with VC, Dr. Trotman created these two "expert" reports also without doing any research into and on the existing medical knowledge of and experience with VC (CR 794). In fact, Dr. Trotman did not consult or review any reference material on VC until two or three weeks before his deposition and just over one month before he was going to testify at trial (CR 793).

Even though at the last-minute Dr. Trotman finally reviewed some reference materials on VC, he still did nothing himself to seek out or obtain this information. He simply reviewed and relied on references provided by Appellant's counsel (CR 793). Dr. Trotman also never made any effort to research the existing medical data to determine if what Appellant's counsel provided accurately and completely represented existing medical knowledge on issues (CR 817).

In addition, Dr. Trotman's opinions were (1) often not supported by any published medical knowledge and experience, (2) contrary to and contradicted by published medical knowledge and experience in the record, (3) contrary to and contradicted by the facts in the case, (4) contrary to and contradicted by his own sworn testimony, and/or (5) not supported by anything other than his own *ipse dixit.*

For the reasons outlined above, and as more fully illustrated by the specific examples below in Sections E.1 through E.6, the record documents there is nothing "scientific" about Dr. Trotman's work in this matter. Dr. Trotman asserted conclusions

31

with no basis and then at the last minute had Appellant's counsel do research to try to support those conclusions. This is not proper. *See, Robinson,* 923 S.W.2d at 559. This also demonstrates Dr. Trotman's opinions were not based on an existing body of scientific or other specialized knowledge, as required by *Robinson* and its progeny.

Further, Dr. Trotman's opinions were not based on a reliable foundation of scientific or professional technique or principle, as required by *Robinson* and its progeny. The record does not establish that either (1) Dr. Trotman's opinions were grounded in the methods and procedures of science, or (2) the underlying scientific technique(s) or principle(s) utilized by Dr. Trotman in reaching his opinions were reliable. As such, under *Robinson* and its progeny Dr. Trotman's opinions amounted to nothing more than "his subjective belief and/or unsupported speculation." *See, Gammill,* 972 S.W.2d at 720; *Robinson,* 923 S.W.2d at 557. Expert testimony of this nature is inadmissible. *Id.* As such, the trial court did not abuse its discretion in excluding/striking Dr. Trotman as an expert witness in this matter.

### 1. Virtual Colonoscopy Was Contraindicated by Diverticulosis:

Without any personal knowledge of or experience with VC or research, Dr. Trotman issued reports stating that the VC performed on Decedent was "dangerous and inappropriate" and was "medically contraindicated and dangerous" because Decedent had diverticulosis in his sigmoid colon (CR 758, 759, 763, 766). Dr. Trotman went on to assert that Dr. Osborne and Viascan should have known this supposed fact on November 1, 2010 (CR 760, 766).

When Dr. Trotman testified under oath at deposition, he admitted that he was not aware of any medical literature stating diverticulosis contraindicates a VC (CR 795). On top of this is the fact that no other expert agrees with this contention (CR 682, deposition of Dr. Blakely, page 205, lines 1-5; CR 439, deposition of Dr. Ritter, page 42, line 21 – page 43, line 7, CR 440, page 45, line 23 – page 46, line 3).

There is nothing "scientific," or reasonably-based or reliable about Dr. Trotman's opinion that VC was contraindicated because Decedent had diverticulosis. In fact, Dr. Trotman's lack of personal knowledge of and experience with VC and his failure to properly consider and utilize medical literature shows there was not a reasonable or reliable basis for this opinion. *See, Wiggs,* 124 S.W.3d at 412-413. Further, while publication support is not a prerequisite for scientific reliability, as stated by the Texas Supreme Court, "courts should be 'especially skeptical' of scientific evidence that has not been published or subjected to peer review." *See, Volkswagen of America, Inc. v. Ramirez,* 159 S.W.3d 897, 905 n.2 (Tex. 2004). Thus, Appellant failed to show the trial court that this opinion was sufficiently reasonably-based and reliable to allow for its admission at trial, since the trial court had nothing upon which to find this opinion was reasonably-based and reliable other than Dr. Trotman's *ipse dixit. See, Gammill,* 972 S.W.2d at 726.

### 2. Diverticulosis in Decedent's Sigmoid Colon Increased the Risk of Rupture in the Cecum:

Within the colon, the sigmoid colon is at one end near the rectum, and the cecum is at the opposite end, about four feet away (CR 258, 685). Dr. Trotman admitted that

Decedent did not have diverticulosis in the cecum (CR 798, 818). It is uncontroverted that Decedent only had diverticulosis in his sigmoid colon, four feet away from his cecum (CR 798).

When asked at deposition whether the existence of diverticulosis in Decedent's sigmoid colon increased the risk of perforation in the cecum, Dr. Trotman stated it did not (CR 799). On July 3, 2014, twenty days after his deposition, Dr. Trotman made changes to his deposition (CR 427). Dr. Trotman did not change this testimony. On this same day, Dr. James Blakely was deposed. Unlike Dr. Trotman, Dr. Blakely has personal experience with and knowledge of VC (CR 680, deposition Page 199, lines 1-14). Dr. Blakely was asked if it was possible that diverticulosis in the sigmoid colon could contribute to a perforation in the cecum (CR 688). Dr. Blakely answered that anything was possible and added, "but I've never seen, read, or heard about that" (CR 688).

On July 8, 2014, in his Declaration, Dr. Trotman completely contradicted his prior sworn testimony admitting that the existence of diverticulosis in the sigmoid colon did not increase the risk of a perforation in the cecum (CR 833). Dr. Trotman went on to claim that the positive relationship between diverticulosis in the sigmoid colon and an increased risk of perforation in the cecum was "well-established in the medical literature" and was known to both gastroenterologists and radiologists (CR 833).

Absent from the Declaration is any description of or citation to the "well-established medical literature." Further, as described above, Dr. Blakely, a radiologist, had never heard of or read about this purported "well-established" fact (CR 688). Also,

on July 3, 2014, Dr. Trotman did not change his earlier deposition testimony admitting under oath that the existence of diverticulosis in the sigmoid colon did not increase the risk of a perforation in the cecum (CR 826).

Based on these facts, Appellant failed to provide the trial court evidence showing that Dr. Trotman's July 8, 2014 new and contradictory opinion that the existence of diverticulosis in the sigmoid colon correlates to an increased risk of perforation in the cecum was sufficiently reasonably-based and reliable to allow for its admission at trial. While Dr. Trotman suddenly claimed on July 8, 2014 this was a known fact and was "well-established in the medical literature," nothing specific was provided to support this new and contradictory opinion. Dr. Trotman in no way, shape, or form cited to even one piece of this supposed "well-established medical literature." Of note, Appellant also did not cite to or provide any of this "well-established" medical literature in her Motion for New Trial (*See,* CR 464-561).

For this new opinion to be reasonably-based and reliable, the trial court would have to believe that for some reason Dr. Trotman completely forgot this "well-established" fact when asked directly about this at his deposition, and it had to believe that he again forgot this "well-established" fact when he reviewed his deposition and made changes to a number of other answers. Absent from the record, is any explanation by Dr. Trotman or Appellant of how and why he could forget this "well-established" fact on June 13, 2014 and on July 3, 2014, but then suddenly remember this fact on the night of July 8, 2014.

The absence of any publication supportive of this opinion required that the trial court be "especially skeptical" of this opinion. *See, Ramirez,* 159 S.W.3d at 905 n.2. When one combines this required skepticism with the other pertinent facts related to this opinion, there is no evidence this opinion was sufficiently reasonably-based and reliable to allow for its admission at trial because it is based on nothing other than Dr. Trotman's *ipse dixit. See, Gammill,* 9972 S.W.2d at 726

### 3. An Optical Colonoscopy Was Safer Than a Virtual Colonoscopy:

Much of the argument before the trial court on Dr. Trotman revolved around whether his opinion that an optical colonoscopy was safer than a VC was sufficiently reasonably-based and reliable to allow for its admission at trial. In review and consideration of the trial court's action in this respect, the Court needs to work from six key underlying facts.

First, when Dr. Trotman issued his reports (with the assistance of Appellant's counsel), he had no personal knowledge of or experience with VC (CR 781, 786). Second, at this time he had not researched or reviewed any medical references on VC (CR 794). Third, Dr. Trotman did not review any medical references about VC until just a few weeks before his deposition and anticipated trial testimony (CR 793). Fourth, the only medical references Dr. Trotman reviewed or utilized were those references selected by and provided to him by Appellant's counsel (CR 793). Fifth, Dr. Trotman wholly relied on Appellant's counsel to locate and provide him with an accurate representation of the existing medical information and data on VC (CR 817). Sixth, Dr. Trotman made

no effort on his own to determine or obtain the existing medical information on VC (CR 794, 817).

Going forward from these six underlying facts, Dr. Trotman admitted at the time of his deposition that, generally speaking, an optical colonoscopy was more dangerous to the patient than a VC (CR 784, 785, 788, 793, 814). With respect to the specific danger at issue, a perforation of the colon, Dr. Trotman admitted at his deposition that the risk of perforation associated with an optical colonoscopy is ten times greater than the risk of perforation associated with a VC (CR 784).

On July 3, 2014, Dr. Trotman changed only one of the many admissions he made in his deposition that the risk of perforation was greater in an optical colonoscopy than in a VC (CR 826). Absent from the record, however, is any evidence that showed the trial court how and why this claim an optical colonoscopy was safer was reasonably-based and reliable. The fact that this claim is not reasonably-based and reliable is established by two things.

First, Dr. Trotman did not change all the other sworn-to answers provided during his deposition in which he admitted that with respect to a procedure on Decedent on November 1, 2010, the date at issue here, the risk of perforation was higher with an optical colonoscopy and that an optical colonoscopy, in terms of colon perforation, would have been more dangerous to Decedent (CR 793, 788). Dr. Trotman also did not change the sworn testimony in which he admitted that perforation of the colon was ten times more likely to occur in an optical colonoscopy (CR 784). Second, none of the references in the record support Dr. Trotman's claim that an optical colonoscopy is safer than a VC.

Again, the lack of personal knowledge of and experience with VC and the failure to properly consider and utilize medical literature shows this opinion did not have a reasonable and reliable basis. *See, Wiggs,* 124 S.W.3d at 412-413. This is further emphasized by the fact that Dr. Trotman produced no reference support for this claim. *See, Ramirez,* 159 S.W.3d at 905 n.2. For these reasons, the trial court had no basis on which it could conclude that Dr. Trotman's opinion an optical colonoscopy was safer than a VC was sufficiently reasonably-based and reliable to allow for its admission at trial. *See, e.g., Gammill,* 972 S.W.2d at 726 (courts are not required "to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert").

### 4. An Optical Colonoscopy Was Mandated if a Polyp Was Found on VC:

A new opinion offered by Dr. Trotman at the time of his deposition was that an optical colonoscopy was mandatory in the event Decedent's November 1, 2010 VC determined that what might have been fecal matter on the October 19, 2010 VC was, in whole or in part, a polyp (CR 795). Dr. Trotman, however, offered nothing to support this opinion beyond his own say-so. Further, with respect to the particular matter at issue, whether a VC can be done in this circumstance when the patient refuses an optical colonoscopy (*See,* CR 145, paragraph 6.03), no other expert agreed with Dr. Trotman's opinion (*See, e.g.,* CR 435, deposition of Dr. Ritter, page 26, lines 11-16; CR 436, page 32, lines 12-16; CR 444, page 64, lines 11-18).

The Court also needs to consider the reference entitled "CT Colonography: Current Status and Future Promise" (CR 696-724). This reference comments on how to

38

handle polyps found on VC. This reference states that "gastroenterologists generally agree" that optical colonoscopy and polyp removal *is not recommended* for polyps found on VC, *unless* the polyp is 6mm in size or larger (CR 717). The reference goes on to state that "this recommendation has been endorsed by the American College of Gastroenterology" (CR 717). Thus, according to most gastroenterologists and the American College of Gastroenterology, the mere fact that a polyp is found on VC does not mandate that an optical colonoscopy and removal of the polyp be done.

Regarding whether Dr. Trotman's opinion on this issue was reasonably-based and reliable, the trial court had on one side Dr. Trotman's unsupported opinion that an optical colonoscopy was mandatory if a polyp was found on Decedent's November 1, 2010 VC. On the other side, was reference documentation of the fact that (1) gastroenterologists generally do not agree with Dr. Trotman's opinion, and (2) the American College of Gastroenterology does not agree with Dr. Trotman's opinion. Thus, Appellant provided the trial court no basis on which it could find that this opinion by Dr. Trotman was sufficiently reasonably-based or reliable to allow for its admission at trial. *See, Gammill,* 972 S.W.2d at 726; *Fennern v. Whitehead,* 2010 Tex. App. LEXIS 4587 *8-13 (Tex. App.—Austin)(Jun. 18, 2010)(no pet.)(mem. op.).

### 5. Colon Perforations Are Seen When Optical Colonoscopy is Performed:

Within thirty days of trial, Dr. Trotman also added the new contention that in terms of detecting perforations at the time of the procedure, an optical colonoscopy was superior to a VC. Dr. Trotman argued this was true because a perforation could be

directly visualized during an optical colonoscopy. This opinion assumes, however, that there is/was a perforation of Decedent's colon at the time of the procedure to visualize; the validity of which will be addressed immediately below in Paragraph E.6.

Regardless, Appellant did not show this opinion was sufficiently reasonably-based and reliable to allow for its admission. First, Dr. Trotman himself personally experienced a situation in which he perforated a patient's colon during an optical colonoscopy and did not appreciate or see the perforation at the time of the procedure (CR 785). Second, during his deposition, Dr. Trotman testified that "scout films" are taken as a matter of routine in VCs and that these studies would show "right away" if a patient's colon had been perforated during the procedure (CR 789). Third, one of the references in the record specifically states that because a VC has the ability to detect amounts of free air that would not otherwise be detected during an optical colonoscopy, it has an advantage over optical colonoscopy in the detection of perforations (CR 569).

Again, the trial court cannot simply accept Dr. Trotman's statements at face value. *See, Gammill,* 972 S.W.2d at 726; *Shanti,* 333 S.W.3d at 913. Appellant did nothing to establish that Dr. Trotman's opinion an optical colonoscopy was more advantageous than VC in detecting colon perforations was sufficiently reasonably-based and reliable to allow for its admission at trial.

### 6. Decedent's Cecum Was Ruptured at the Time of His November 1, 2010 Virtual Colonoscopy Due to Overinflation:

As outlined above on pages 12-14 within Paragraph B.3 of Dr. Osborne's Statement of Facts, Dr. Trotman claims that Decedent's cecum was ruptured during the

November 1, 2010 VC because his colon was improperly overinflated causing his cecum to pop (CR 799). Dr. Trotman and Appellant, however, did not present any evidence to the trial court that established this opinion was sufficiently reasonably-based and reliable to allow for its admission at trial.

The underlying facts, as admitted by Dr. Trotman during his deposition, are (1) air forced out of the colon and into the abdomen during this occurrence usually stays in the abdomen (CR 199), (2) studies like x-rays and CT scans have the ability to detect air in the abdomen (CR 808), (3) even "a little tiny bit of air can fill a lot of space in the abdominal – in the abdomen" (CR 789), and (4) the radiologists who interpreted x-rays and CTs on Decedent in the days immediately following November 1, 2010 saw no free air indicative of such a perforation (CR 788-89, 667, 685).

Dr. Trotman claims that he sees some "little air bubbles" on these studies the radiologists did not see (CR 799). This purported finding by Dr. Trotman, however, is not consistent with Dr. Trotman's underlying contentions that (1) Decedent's colon was overinflated to the point that it burst, (2) that under this situation, when air is forced out through the colon and it pops that air usually stays in the abdomen, and (3) that even a little tiny bit of air can fill "a lot of space" in the abdomen. Given these underlying facts admitted by Dr. Trotman, where is all the air that should be in Decedent's abdomen? Dr. Trotman admitted that it was not in Decedent's colon (CR 809). Dr. Trotman and Appellant did not fill this analytical gap to show the trial court that his opinion Decedent's colon was overinflated during his November 1, 2010 VC to the point that his

41

cecum popped and ruptured was sufficiently reasonably-based and reliable to allow for its admission at trial.

**7. Significant Air Was Not Present Because Bleeding and Spontaneous Blood Clotting Immediately Sealed the Rupture of the Cecum During the VC:**

In an effort to circumvent the fact that he could not account for the free air that should have been present in Decedent's abdomen if his theory Decedent's colon was overinflated to the point that it ruptured and popped was correct, Dr. Trotman threw out the "bleeding and spontaneous blood clotting" theory as outlined above on pages 14-17 within Paragraph B.3 of Dr. Osborne's Statement of Facts. Dr. Trotman and Appellant, however, did not provide the trial court anything to show that this theory was sufficiently reasonably-based and reliable to allow for its admission at trial.

The primary issue with Dr. Trotman's "bleeding and spontaneous blood clotting" theory is that it is supported by nothing other than Dr. Trotman's *ipse dixit*. This theory has no factual support and, in fact, is controverted by the underlying case facts and medical facts.

The key underlying facts that do not support and contradict this theory are (1) Decedent was taking a medication that reduced his blood's ability to clot at the time of this occurrence, and (2) the ability of Decedent's blood to clot was four times worse than it should have been at this same time. Thus, based on the applicable and uncontroverted underlying facts, at the time of Decedent's November 1, 2010 VC, the probability was that if he started to bleed at that time because his cecum popped and ruptured, that bleeding would continue and would not stop. In particular, that bleeding

42

would not and could not spontaneously stop, seal the ruptured cecum, and thereby prevent the overabundance of air in Decedent's colon that caused his cecum to pop and rupture from going into his abdomen and being found on subsequent radiology studies.

Dr. Trotman's "bleeding and spontaneous blood clotting" is also not reasonably-based and reliable because it still does not explain what happened to the large amount of air that would necessarily be present somewhere inside Decedent if Dr. Trotman's over-inflation theory has any validity. Even though Dr. Trotman admits this air should be in Decedent's abdomen, it is not there. The only other place it could be is in Decedent's colon, but Dr. Trotman admitted it was not there either (CR 809). For all of these reasons, Dr. Trotman and Appellant did not show that this opinion was sufficiently reasonably-based and reliable to allow for its admission at trial.

### F. The Trial Court Also Had The Ability and Discretion to Exclude Opinions By Dr. Trotman That We Not Time Disclosed In Response To Outstanding Discovery Requests:

Another issue raised by Dr. Osborne and Viascan with respect to many of Dr. Trotman's opinions, and the bases of his opinions, was the fact that Appellant did not timely and properly disclose this information. Trial courts have the ability to exclude testimony based on inadequate and/or untimely discovery responses or supplementation. *See,* TEX. R. CIV. PROC., Rules 193.5, 193.6, 195.6(a); *Aluminium Co. of America v. Bullock,* 870 S.W.2d 2, 4 (Tex. 1994); *VingCard A.S. v. Merrimac Hospitality Sys,* 59 S.W.3d 847, 856 (Tex. App.—Fort Worth 2001, pet. denied). *See also, Umanzor v. Helfand,* 1998 Tex. App. LEXIS 4130 *13 (Tex. App.—Dallas 1998, pet. denied)(not designated for publication)(citations omitted). In fact, under the TEXAS RULES OF CIVIL

PROCEDURE, untimely expert testimony must be excluded unless good cause, lack of unfair surprise and lack of unfair prejudice is established by the party seeking to introduce the evidence at issue. TEX. R. CIV. PROC., Rule 193.6(a).

Contrary to Appellant's contentions, Dr. Trotman's opinions were not simply "refined" or "perfected" within thirty days of trial. The fact of the matter is that it was not until that time that there was any possible valid basis or substance whatsoever to Dr. Trotman's opinions.

Prior to late May 2014, Dr. Trotman's opinions related to VC were neither based on any personal knowledge or experience he had with VC, nor we they based on any research on or review of the relevant medical literature (CR 793. 794). When Dr. Trotman was provided with certain references on VC selected by Appellant's counsel sometime around May 23-30, 2014, Appellant's counsel did not disclose to Dr. Osborne or Viascan that Dr. Trotman had been provided and was utilizing this information. Specifically, Appellant did not advise Dr. Osborne and Viascan of this when she supplemented her Responses to Request for Disclosure on June 5, 2014 (CR 739-54). It was not until Dr. Trotman's June 13, 2014 deposition that Dr. Osborne and Viascan learned this fact (CR 806).

Absent from the record is any justification for this action by Appellant. In fact, as admitted by Dr. Trotman, Appellant's counsel helped him create his First Report and his Second Report. Accordingly, counsel was aware Dr. Trotman's opinions related to VC in these reports were not based on any personal knowledge or experience, and were not based on any research on or review of the medical literature by Dr. Trotman. Appellant's

44

counsel were also aware that Dr. Trotman did not review any medical literature in connection with his work on this case until they sent him their hand-selected literature around May 23-30, 2014, because he asked them to research the relevant issues for him (CR 793-94).

Appellant was also aware when her disclosure responses were last supplemented on June 5, 2014 of the fact that (1) she had recently provided Dr. Trotman certain medical references for review in this matter, (2) Dr. Trotman would utilize and rely on this information to support his opinions in this matter (since he had nothing else on which he could base his opinions), and (3) Dr. Trotman was going to have additional opinions and additional bases for his opinions that were not reflected in the reports previously provided. In spite of being aware of these facts, Appellant did not include this information in her June 5, 2014 supplementation. Further, Appellant did not provide the trial court any form or manner of evidence showing good cause, lack of unfair surprise or lack undue prejudice for her failure to timely supplement and disclose this information, any new opinions by Dr. Trotman, and the new bases for opinions previously disclosed.

## G. Conclusion:

Appellant did not carry her burden to show Dr. Trotman's opinions were sufficiently reasonably-based and reliable to allow for their admission. First and foremost, Appellant did not provide the trial court necessary evidence that established the principles, research and methodology underlying Dr. Trotman's opinions, and that the manner in which these principles, research and methodologies applied by Dr. Trotman to

45

reach his opinions were both sufficiently reasonably-based and reliable to allow for admission of his opinions at trial. *See, Camacho,* 298 S.W.3d at 637.

The record shows that any and all of Dr. Trotman's opinions related to VC do not come from any personal knowledge or experience with VC. The record also shows Dr. Trotman did no research for this case and that the research he did use and rely on was limited to what Appellant's counsel chose to send to him just two or three weeks before his deposition (CR 793-4, 817).

Thus, the conclusions and opinions Dr. Trotman reached and held from April 2012 until late May 2014 were conclusions and opinions reached without either (1) any personal knowledge of VC and (2) any research into and determination of the relevant medical literature, or consultation of the relevant medical literature. About two years later, when Dr. Trotman got around to considering the relevant medical literature as his deposition approached, he did nothing himself. He chose to utilize what Appellant's counsel found and elected to provide him. It is impossible to claim with any credibility that Dr. Trotman's approach to this case is reflective of any reasonably-based or reliable application of scientific or professional principles, research and methodology.

Dr. Trotman's actions in no way, shape or form provided the trial court with a basis from which it could conclude and ensure that his opinions comported with "applicable professional standards outside the courtroom" and that his opinions had "a reliable basis in the knowledge and experience" of medicine, as required under *Gammill. See, Gammill,* 927 S.W.2d at 725-26. Again, Dr. Trotman reached his initial opinions about VC with the assistance of Appellant's counsel and absent any personal knowledge

46

of, experience with or research into that procedure. Further, to the extent Dr. Trotman utilized medical knowledge of and experience with VC, he did nothing on his own accepted as complete and representative the information provided to him by Appellant's counsel two or three weeks before his June 13, 2014 deposition (CR 793).

The bottom line is that there was nothing "scientific" whatsoever about Dr. Trotman's work in this matter. As stated by the Texas Supreme Court in *Robinson,* the scientific process does not involve reaching a conclusion and then doing research to support that conclusion. *Robinson,* 923, S.W.2d at 599. That, however, is exactly what Dr. Trotman did here. With the assistance of Appellant's counsel, Dr. Trotman, wrote reports stating the attempt to perform a VC on Decedent was below the applicable standard of care and a proximate cause of Decedent's death without having any personal knowledge of or experience with the procedure and without doing any research on the procedure. Then, two years later and shortly before his deposition and trial testimony, Appellant's counsel did research in an effort to provide basis and support for Dr. Trotman's opinions.

The Texas Supreme Court in *Robinson* also stated that for an expert's testimony to be reasonably-based and reliable, the expert has to reason from known facts and principles to reach a conclusion. *Id.* Dr. Trotman did not follow this dictate and could not follow this dictate because when he first reached his conclusions he did not have any personal knowledge of or experience with the known facts and principles of VC, and had not done any research into the known facts and principles associated with VC.

The additional facts in the record that show Dr. Trotman's opinions are internally contradictory, are admittedly not supported by medical literature, are directly contradicted by medical literature, contain analytical gaps, and were changed to the extent that new sworn-to opinions directly contradicted old sworn-to opinions, further establishes and shows that Dr. Trotman's opinions are not the result of a reasonably-based and reliable scientific or professional approach or methodology.

The bottom line is that Dr. Trotman was going to provide expert opinions to support Appellant's case regardless of (1) his personal knowledge and experience (or lack thereof), (2) the underlying facts, (3) information in medical references, and (4) his prior statements and sworn testimony. For these reasons, the trial court did not abuse its discretion when it excluded and struck Dr. Trotman.

## II. The Trial Court Did Not Abuse Its Discretion In Denying Appellant's Motion For Continuance So Appellant Could Locate A New Expert:

Appellant did not move for a continuance in this matter until after she unconditionally announced ready for trial (CR 461). In fact, Appellant did not move for a continuance in this matter until after (1) she was aware that Dr. Trotman was being challenged, (2) she announced unconditionally that she was ready for trial, (3) a jury panel had be obtained and answered jury questionnaires, (4) the Court heard arguments of counsel on the challenge to Dr. Trotman over three separate days, and (5) the trial court struck Dr. Trotman.

Generally, a trial court's ruling on a motion for continuance is reviewed under an abuse of discretion standard. *See, State v. Wood Oil Distrib.,* 751 S.W.2d 863, 865

48

(Tex. 1988); *Villegas v. Carter,* 711 S.W.2d 624, 626 (Tex. 1986). When a party announces ready for trial, however, a motion for continuance is waived. *See, E.C. v. Graydon,* 28 S.W.3d 825, 828 (Tex. App.—Corpus Christi 2000, no pet.). Thus, by announcing unconditionally that she was ready for trial, Appellant waived her ability to obtain a continuance.

Based on her briefing, it appears that Appellant claims she was entitled to a continuance under Rule 252 of the TEXAS RULES OF CIVIL PROCEDURE based on the want of testimony. Appellant's motion for continuance, however, is not supported by evidence or information needed to comply with the requirements of Rule 252. Specifically, Appellant did not establish that she used due diligence through the discovery period to obtain such evidence.

As explained and outlined above in Paragraph I.E of Dr. Osborne's Argument, long before the July 8, 2014 trial setting Appellant was aware of the limitations of Dr. Trotman's impressions and opinions in this matter and that those opinions and impressions were being challenged. Appellant was also aware of the fact that she consciously elected not to fully supplement her discovery responses on June 5, 2014. Even though Appellant was well-aware of these facts, she still announced unconditionally ready for trial prior the trial court's July 9, 2014 order striking Dr. Trotman. As such, Appellant has no basis on which she can show that the trial court abused its discretion in denying her motion for continuance.

## **CONCLUSION**

There was no abuse of discretion by the trial court in (1) excluding/striking Dr. Trotman and (2) denying Appellant's motion for continuance. The fact of the matter is that Appellant failed to carry her burden to show (1) that Dr. Trotman's opinions were (a) sufficiently reasonably-based and reliable to allow for their admission at trial, and/or (b) that Dr. Trotman's opinions and the bases for those opinions were properly and timely disclosed to Dr. Osborne and Viascan, and (2) that she was entitled to a continuance of the July 8, 2014 trial setting.

For these reasons, as more fully outlined and discussed in above in Dr. Osborne's Argument section, the trial court did not abuse its discretion is excluding/striking Dr. Trotman and the trial court did not abuse its discretion in denying Appellant's motion for continuance. Accordingly, the trial court's action below should in all things be affirmed.

## PRAYER

Because the trial court did not abuse its discretion in (1) excluding/striking Dr. Trotman and (2) denying Appellant's Motion for Continuance, Appellee John Andrew Osborne, M.D., Ph.D., F.A.C.C. respectfully requests that the Fifth Court of Appeals affirm the trial court's actions below and its dismissal of Appellant's claim against him in this matter.

Respectfully Submitted,

THIEBAUD REMINGTON THORNTON BAILEY, L.L.P.

By: /s/Russell G. Thornton
**RUSSELL G. THORNTON**
State Bar Card No. 19982850
rthornton@trtblaw.com

1445 Ross Avenue, Suite 4800
Dallas, Texas 75202
(214) 954-2200
(214) 754-0999 (Fax)

**COUNSEL FOR APPELLEE**
**JOHN ANDREW OSBORNE, M.D., Ph.D.,**
**F.A.C.C.**

## CERTIFICATE OF COMPLIANCE

Pursuant to TEXAS RULES OF APPELLATE PROCEDURE 9.4(i)(3) Appellant certifies that his Brief on the Merits, filed on January 30, 2015, in the Fifth Court of Appeals, contains **12,538** words.

/s/ Russell G. Thornton
**RUSSELL G. THORNTON**

## CERTIFICATE OF SERVICE

The undersigned certifies that on the **30th** day of **January, 2015**, a true and correct copy of the foregoing document was delivered to counsel listed below:

Mr. Lawrence R. Lassiter                                           **VIA E-SERVE & CMRRR**
Mr. Les Weisbrod
Mr. Luke Metzler
MILLER WEISBROD, L.L.P.
11551 Forest Central Drive, Suite 300
Dallas, Texas 75243
llassiter@millerweisbrod.com
lweisbrod@millerweisbrod.com
lmetzler@millerweisbrod.com

Mr. D. Bradley Dickinson                                          **VIA E-SERVE & CMRRR**
J. Robert Skeels
DICKINSON BARTLETT, P.C.
4849 Greenville Avenue, Suite 1550
Dallas, Texas 75206
brad@dblaws.com
rskeels@dblaws.com

/s/ Russell G. Thornton
**RUSSELL G. THORNTON**